McKEE & WIFE
*vs*
BUFORD &c.

proceedings had, not inconsistent with the principles of this opinion.

*Pindell* for plaintiff: *McCalla* for defendant.

CHANCERY.

# McKee and wife *vs* Buford, &c.

APPEAL FROM THE WOODFORD CIRCUIT.

*Case* 117.

*Distributions. Administrators. Descents.*

*May* 16.

JUDGE MARSHALL delivered the opinion of the Court.

The case stated and decree of Circuit Court.

IN 1817, Jonas Chrisman died intestate, leaving a considerable estate in slaves and personalty, and his son, Peter Chrisman, the eldest of eight children of the decedent, administered on his estate, and in 1822 he died insolvent, and without issue, and unmarried. One third of the personalty was allotted, by commissioners, to the widow of Jonas Chrisman: but by general arrangement of the family, it was agreed that the widow should remain on the farm with the younger children, and that she should retain the slaves without a division. Under this arrangement a considerable portion of the personalty, beyond the widow's third, was left with her; and the children seem generally to have received their portions when they married or left their mother's house. About the year 1825 or 1826, Christiana, one and perhaps the youngest daughter, intermarried with James McKee, and on leaving the family mansion, they received various articles of personalty, amounting in value to about $174 50. In 1831, McKee and wife filed this bill for an account and distribution, against William Buford and others, as the sureties of Peter Chrisman, in his administration bond, making their co-distributees parties. In the progress of the suit, the widow of Jonas Chrisman died, and McKee administered on her estate. A division was then made of the slaves of the estate of Jonas Chrisman, and a negro boy, Wilson, having been allotted, at the estimated value of $400, to the share of Peter Chrisman, deceased, subject to the payment of $111, to Lee and wife, in right of the latter as co-distributee, Buford claiming to repre-

sent said Peter and to control the slave allotted to Peter for his indemnity as surety, proposed that McKee should retain said slave subject to the final issue of this suit, which was accordingly done. This division and arrangement seems to have occurred in 1832, and on the hearing in 1842, the Court having decreed a balance in favor of McKee, in right of his wife, decreed further, that he should be charged with the hire of the slave, Wilson, amounting to $600, and that said slave should be sold, and that the proceeds of the sale and hire, after satisfying the distributive share decreed to McKee and wife, and paying to Buford the sum of $111, with interest, which is assumed to have been paid by him on account of said slave, should be distributed among the brothers and sisters of Peter Chrisman and their representatives.

McKee complains of this decree: 1st. On the ground that *Objections urged to the decree.* the distributive share decreed in right of his wife, is too small; and secondly, that it was improper to charge him with the hire of the slave, Wilson, and to decree said slave to be sold and the proceeds distributed as directed in the decree. It is also assigned for error that the proper parties were not before the Court. But upon examination, it appears that Mary Craig, one of the daughters of Jonas Chrisman, who was supposed not to have been before the Court, was served with process in 1831; and as it does not appear certainly that the heirs of William Chrisman were infants, the failure to appoint a guardian *ad litem* for them cannot be regarded as error.

1. In support of the first objection to the decree, as above stated, it is contended that the administrator should have been charged with the hire of the slaves of Jonas Chrisman, for some period after his death, and that Mrs. McKee having been an infant when the arrangement was made, by which the slaves were left in possession of her mother, her interest ought not to be affected by it. But it may be presumed that although she had not then arrived at full age, she understood the arrangement, and she does not appear to have objected to it when she did arrive at full age, or within any short period afterwards. Besides, there were then only three or four slaves, of which, upon a division, the widow would have been entitled to

*The intestate left only a few slaves, to one third of which the widow was entitled as dower, the family, with the concurrence of the administrator remained together, keeping the slaves together also, for the support of the family. One of the younger children, who with others, had lived in the family, not permitted to hold the administrator to strict*

McKEE & WIFE
*vs*
BUFORD &c.

account for hire,
not having ob-
jected before nor
shortly    after
coming of full
age.

one-third for life, and as the residue could not have been divided in kind, but must have been sold, it may be fairly presumed that the arrangement made by the common consent of the members of the family who were capable of acting, was in fact more beneficial to all, and especially to the younger children, than if the alternative of divid- ing the slaves had been adopted. Nor can it be said that it would have been more beneficial to the complainant, Mrs. McKee, that the slaves should have been hired out. She was probably better supported and educated, and re- ceived a better portion in· the ultimate division of the slaves, than if they had been hired out from the first, in which case the small pittance of the hire that would have belonged to her would have been of but little value. But be this as it may, the administrator had a right to have the slaves divided, and would have had them divided but for the arrangement above mentioned; and as that arrangement was obviously more advantageous to the younger children than a division would have been, we think it would be inequitable for the complainant, after having enjoyed that advantage, to claim also the benefit which might have resulted from a different course; and to hold the sureties of the administrator liable for his ac- quiesence in an arrangement, adopted by common con- sent, for the common benefit. There was no error, there- fore, in omitting to charge the administrator with the hire of slaves.

2. Another objection to this part of the decree is, that the account of the administrator was improperly credited with the whole amount of a debt from Lee, alledged to have been insolvent, when, as it is said, he is also cred- ited for a payment made to the same Lee. This might be an error, if the fact be as here supposed: but there is no evidence of any such credit for a payment to Lee, and the only allusion to it, is in an exception to a Com- missioner's report which was set aside by the Court.

The son dying be-
fore the mother,
is entitled to no
part of her es-
·tate.

3. A third objection is, that McKee, who as adminis- trator of the widow of Jonas Chrisman, had in his hands the personal estate of which she died possessed; was charged with one eighth part thereof, as the share of Peter Chrisman, and the same was applied as a credit or pay-

ment of so much of the distributive share of his wife in Jonas Chrisman's estate. As Peter Chrisman died many years before his mother, he had no interest in her personal estate, and this item was therefore improperly applied as a charge against the interest of McKee and wife, in the estate of Jonas Chrisman—and for this error, the decree must be reversed. But if, as is not probable, any part of the personal estate of Jonas Chrisman remained in possession of his widow until her death—and if, which is also improbable, Peter Chrisman did not receive his full distributive share, his interest in the residuum might be subjected to the satisfaction of the complainant's claim.

4. With regard to the articles of personalty received by McKee and wife, from the widow of Jonas Chrisman, it is not very clear from the evidence whether this should be considered as an advancement by Mrs. Chrisman out of her own estate or out of the estate of her husband: but as an indefinite amount of the personal estate of Jonas Chrisman was placed in the hands of the widow, beyond her thirds—and as, after the death of her son, the administrator, no further administration was granted, and she, by common consent, retained the possession and control of the property, distributing it among the children as she thought fit, we are inclined to the opinion, that the sureties of the administrator should have the benefit of these distributions, and that this item was properly charged against the distributive share of McKee and wife. If it should turn out that the distribution has been in fact unequal, this inequality may be partially or wholly remedied, in the distribution of the estate left by Mrs. Chrisman, who acted virtually as administratrix after the death of Peter Chrisman.

5. It is contended on the part of the complainants, that the arrangement between McKee and Buford, in regard to the slave, Wilson, was in effect, a sale at the price of $400, then put upon him by the Commissioners, subject to the payment of $111 to one of the co-distributees, and that McKee was to be accountable for this value to Buford, in case of a decree against him in this suit, or in a different event, to the persons interested in Peter Chris-

man's estate; and that he is, at most, chargeable for the principal sum and interest, and not bound otherwise to account for the slave or his hire. On the part of Buford, it is contended that there was no sale, but the slave was left in possession of McKee principally as an indemnity to the sureties, and to be accounted for according to the event of the suit. There is a discrepancy in the evidence on this subject, and it might be very difficult to determine the question at issue, upon a mere comparison of the testimony bearing directly upon it: but as the slave, being a part of the estate of Peter Chrisman, the administrator, was certainly a proper indemnity for his sureties, as Buford being only one of these sureties, had no separate interest in the slave—no right to impair the indemnity as to the others, and could hardly be supposed to have been willing to have done so, even as far as he was himself concerned; as, moreover, in one event of the suit he would be under no liability, and would therefore, have no interest in the slave. which would be then subject to the claims of other persons with whom he had no connection whatever; and as, in any aspect of the case, he had no right to sell the slave, or to dispose of him otherwise than merely to insure his being forthcoming, there is a very strong presumption which might be deemed sufficient to determine the question, otherwise doubtful, in favor of the conclusion, that the arrangement was in fact such as he contends it to have been; and this accords manifestly with the equity of the case, which requires that McKee, holding in his hands the indemnity of the sureties, while he is seeking to make them liable for the default of their principal, should not only produce the indemnity itself, but account also for the profits actually made from its use, when their liability, being fixed, the account between them comes to be finally adjusted.

The hire of the slave was therefore properly chargeable against McKee, as a set off against so much of his distributive share in Jonas Chrisman's estate, and the slave is subject to be sold to make up any deficiency in the hire, to meet either the said distributive share, or the sum of $111 with its interest, to which the slave was made subject in the division. If these demands should

be satisfied without a sale, a sale would of course be im-
proper, unless prayed for by those interested in the estate
of Peter Chrisman. The slave himself, if unsold, or
the surplus proceeds, after satisfying the demands men-
tioned, will belong to Peter Chrisman's estate, the final
disposition of which, if it should be appropriate in this
suit, will depend upon the shape which it may hereafter
assume.

It may be necessary to remark, that we do not deter-
mine to what extent the amount of the administrator or
his sureties should be credited on account of the alledged
insolvency of debtors to the estate of Jonas Chrisman,
but leave that matter, as well as the sum to be charged
for the reasonable hire of the slave, Wilson, for future
ascertainment.

But we are of opinion, that McKee and wife are enti-
tled to interest on their distributive share from the time
he obtained possession of the slave, Wilson, under the
arrangement with Buford above mentioned.

The decree is reversed, and the cause is remanded,
with directions to refer the matters of account in this
case to a Commissioner, to ascertain and adjust the
same, and for further proceedings, and decree according
to the principles of this opinion.

*Owsley & Goodloe and Monroe* for appellants: *More-
head & Reed* for appellees.